RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARY ANN BENDER,

*Plaintiff-Appellee*,

*v.*

No. 25-3540

VILLAGE OF MARIEMONT, OHIO,

*Defendant*,

NICHOLAS PITTSLEY and PAUL RENNIE, Police Officers
for the Village of Mariemont, Ohio,

*Defendants-Appellants*.

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:23-cv-00051—Douglas Russell Cole, District Judge.

Argued:  March 19, 2026

Decided and Filed:  June 30, 2026

Before:  MOORE, THAPAR, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Katherine L. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Mason, Ohio, for Appellants.  Stephen E. Imm, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Katherine L. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Mason, Ohio, for Appellants.  Stephen E. Imm, Matthew S. Okiishi, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court in which MATHIS, J., concurred. THAPAR, J. (pp. 29–32), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Mary Ann Bender was the primary caregiver for her friend Rita Cole.  While caring for Cole, Bender resided in Cole's condominium ("the condo") with her.  After Cole died, ownership of the condo transferred to Cole's living trust, of which Bender became trustee.  Bender remained in the condo for approximately one month after Cole's death because Bender was ill and needed time to remove belongings that she had moved into the condo while caring for Cole.  Cole's nephew, Kevin Surette, contacted the police and asked them to accompany him to the condo to evict Bender.  Kevin Surette showed Officers Nicholas Pittsley and Paul Rennie ("the Officers") a copy of a superseded version of Cole's will, which the Officers took only a cursory glance at, that named Kevin Surette as a beneficiary but did not mention the condo.  The Officers accompanied Kevin Surette to the condo and, according to Bender, told Bender that she had ten minutes to leave the condo, threatened to arrest her, pushed her out the door, and took her key.  Bender sued the Officers, among others, alleging that their active participation in the eviction constituted an unreasonable seizure in violation of the Fourth Amendment.  The Officers moved for summary judgment, arguing that they are entitled to qualified immunity.  The district court denied the Officers' motion, and the Officers now appeal the district court's order.  For the reasons that follow, we **AFFIRM** the district court's order denying summary judgment.

## I. BACKGROUND

### A.  Facts

Mary Ann Bender and Rita Cole were "best friend[s] for over 20 years."  R. 27 (Bender Dep. at 21:18–23) (Page ID #306).  For the last five years of Cole's life, Bender was her primary caregiver because Bender "was the only one willing to" care for her.  *Id.* at 22:20–22 (Page ID #307).  During that time, Bender moved into Cole's condo in Cincinnati because Cole "couldn't be left alone."  *Id.* at 26:4–8 (Page ID #311).  Bender also owned her own home, and she and Cole "went back and forth" between Bender's home and the condo before Cole became unable to

do so, but Bender and Cole always spent nights at Cole's condo. *Id.* at 26:12–25 (Page ID #311). Bender moved clothing and other belongings into the condo to make it easier to care for Cole while residing there. *Id.* at 33:4–12 (Page ID #318). Cole died on April 8, 2022. *Id.* at 78:3–5 (Page ID #363).

Before Cole died, she executed several estate-planning documents. Cole created a living trust in 2013, R. 41-11 (Living Trust Agreement at 1) (Page ID #1163), and amended it in 2014, R. 41-11 (First Am. to Living Trust at 2) (Page ID #1176). The amendment named Kevin Surette as one of several trust beneficiaries and Robert Surette as trustee upon Cole's death. *Id.* at 1 (Page ID #1175). Bender was named as the successor trustee, *id.*, and in 2016 Robert Surette indicated that he was unable to serve as trustee and "request[ed] that Mary Bender . . . serve in [his] place," R. 41-11 (Trustee Resignation) (Page ID #1188). Upon Cole's death, the condo was to become property of the trust. R. 41-11 (Transfer on Death Designation Aff.) (Page ID #1177). Cole also executed two wills. First, Cole signed a will in 2015 that named R.J. Connelly III as executor and Kevin Surette as one of several beneficiaries. R. 41-11 (2015 Will at 1–2, 8) (Page ID #1179–80, 1186). In 2021 Cole executed a will that "revok[ed] all other . . . Wills" and named only Karen Nelligan and Denise Surette as beneficiaries. R. 41-11 (2021 Will at 1–2) (Page ID #1189–90).

Based on those estate documents, when Cole died on April 8, 2022, ownership of the condo transferred to the trust and Bender became trustee. Following Cole's death and funeral, Bender continued to live at the condo. R. 27 (Bender Dep. at 78:9–16) (Page ID #363). Denise Surette, who is Cole's niece and Kevin Surette's sister, told Bender that she could reside in the condo temporarily. *Id.* at 82:21–83:10 (Page ID #367–68). Denise Surette was the executor and a beneficiary of Cole's 2021 will, but she was not a trust beneficiary. R. 41-11 (First Am. to Living Trust at 1) (Page ID #1175); R. 41-11 (2021 Will at 1) (Page ID #1189). Bender planned to vacate the condo by the end of May because "that's the amount of time [she] thought it would take [her] to get [her] things out" and she was "ill and was getting back on her feet." R. 27 (Bender Dep. at 83:14–25, 93:11–19) (Page ID #368, 378). Bender was seventy-six years old at the time.

On May 6, 2022, Kevin Surette, Cole's nephew, was informed by his cousins that Bender was at the condo "removing items and destroying documents."  R. 33 (Kevin Surette Dep. at 51:22–25) (Page ID #724).  It is unclear how his cousins would have known this because they were "out of state."  *Id.* at 70:24–71:16 (Page ID #743–44).[1]  Kevin Surette went to the police station and asked Officers Pittsley and Rennie to accompany him to the condo because he was "concerned that" Bender "was still on the property" and wanted her "to leave."  R. 32 (Rennie Dep. at 25:3–16, 30:9–17) (Page ID #635, 640); *see also* R. 33 (Kevin Surette Dep. at 50:19–51:5) (Page ID #723–24).  Kevin Surette showed the Officers Cole's 2015 will, R. 32 (Rennie Dep. at 24:12–19) (Page ID #634); R. 31 (Pittsley Dep. at 56:22–57:6) (Page ID #566–67), which listed him as a beneficiary, R. 41-11 (2015 Will at 2) (Page ID #1180).[2]  The Officers only glanced at the title of the will and saw that Kevin Surette's name was in the will; they did not "inspect" or fully read the will.  R. 32 (Rennie Dep. at 24:14–19) (Page ID #634); R. 31 (Pittsley Dep. at 56:22–57:25) (Page ID #566–67).  We know that the Officers did not even read the first page of the will because Kevin Surette told the Officers that he was the executor of the will and the Officers accepted that as true, R. 31 (Pittsley Dep. at 58:1–9) (Page ID #568); R. 32 (Rennie Dep. at 24:14–19) (Page ID #634); R. 27-4 (Incident Report at 2) (Page ID #490), but on the very first page of the will, R.J. Connelly III was named as the executor and Kevin Surette was named only as a beneficiary on the second page, R. 41-11 (2015 Will at 1–2) (Page ID #1179–80).  Kevin Surette did not present the Officers with a court order or other documentation to support his claim to the condo.  R. 32 (Rennie Dep. at 29:14–18, 52:14–19) (Page ID #639, 662); R. 31 (Pittsley Dep. at 53:7–13, 59:19–25) (Page ID #563, 569).  Prior to May 6, Kevin Surette had not contacted Bender about the condo, let alone taken any legal action.  R. 33 (Kevin Surette Dep. at 51:6–14, 54:15–22) (Page ID #724, 727).

---

[1]From this point on, what occurred is disputed by the parties.  This appeal comes to us in an interlocutory posture following the denial of summary judgment, so we must view the facts in the light most favorable to Bender as the nonmoving party.  Therefore, we describe what transpired based on the evidence viewed in Bender's favor, even though we acknowledge that the Officers dispute her account.  *See Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024); *Cochran v. Gilliam*, 656 F.3d 300, 305–06 (6th Cir. 2011).

[2]The record is not entirely clear as to which will Kevin Surette showed the Officers, but he was not named in the 2021 will—so a reasonable inference is that he showed the Officers the 2015 will.

The Officers accompanied Kevin Surette to the condo and met him in the condo building's parking lot. R. 32 (Rennie Dep. at 31:15–18) (Page ID #641). They walked to the door of the condo together and knocked. R. 33 (Kevin Surette Dep. at 53:1–4) (Page ID #726). The Officers stood in front of Kevin Surette, and when Bender answered the door, the Officers "ask[ed] her why she was in the . . . condo[]." *Id.* at 53:5–54:14 (Page ID #726–27). The Officers and Kevin Surette then "pushed their way into the condo," R. 27 (Bender Dep. at 93:9–10) (Page ID #378), and the Officers "asked her if she had a right to be there," R. 33 (Kevin Surette Dep. at 54:1–5) (Page ID #727). Bender told them that she was staying at the condo because she was "ill and was getting back on her feet." R. 27 (Bender Dep. at 93:11–19) (Page ID #378). She also asked the Officers to see a warrant, told them that they needed a warrant to enter the condo, asked to see the will that Kevin Surette had shown the Officers, told them that she "kn[e]w [Cole's] last will was" executed in 2021, and told them that she "had the only true will." *Id.* at 101:8–102:1 (Page ID #386–87). The Officers refused to show Bender the will that Kevin Surette presented to them. *Id.*

Once inside the condo, one of the Officers asked Kevin Surette, "when did you want her out of here, Kevin? And Kevin said, today." *Id.* at 94:16–23 (Page ID #379). The Officer then told Bender that she "ha[d] ten minutes" to gather her belongings and leave the condo. *Id.* Bender does not recall if the Officers physically touched her, but she testified that they were "pushing [her]" to exit the condo. *Id.* at 99:10–25 (Page ID #384). Rennie told Bender "at least ten times" that she "was going to jail" and to take photos of her personal belongings in the condo. *Id.* at 102:9–19, 106:1–25 (Page ID #387, 391). Ultimately, Pittsley issued Bender a citation. *Id.* at 108:23–109:2 (Page ID #393–94); R. 31 (Pittsley Dep. at 90:5–13) (Page ID #600); R. 27-4 (Incident Report at 2) (Page ID #490).

Pittsley told Bender to "[g]ive [him] [her] key" to the condo and "took [her] key." R. 27 (Bender Dep. at 122:20–123:14, 125:19–126:1) (Page ID #407–08, 410–11). The Officers then "pushed [her] out the door and harassed [her] about going to jail." *Id.* at 122:20–25, 124:18–22 (Page ID #407, 409). The Officers left the condo only after they removed Bender, and Bender went to a neighbor's condo in the same complex because she was "too shaken" to drive to her home immediately. *Id.* at 107:6–10 (Page ID #392). The police report states that the "Officers

made contact with Ms. Bender inside of the residence and advised her that Mr. Surette was an executor of Ms. Cole's will, and was acting on behalf of himself and others listed in the will, and requested that Ms. Bender leave the residence and not return." R. 27-4 (Incident Report at 2) (Page ID #490). Rennie's daily activity log stated that he "assisted . . . with removing Mary Bender from the residence." R. 41-12 (Rennie Activity Log at 1) (Page ID #1229).

## B.  Procedural History

Bender sued Kevin Surette, Pittsley, Rennie, Chief of Police and Fire Richard Hines, and the Village of Mariemont. R. 1 (Compl.) (Page ID #1). She alleged, as relevant here, that Pittsley and Rennie violated the Fourth Amendment by evicting her from the condo. *Id.* ¶¶ 35–41 (Page ID #5–6). Following discovery, Pittsley, Rennie, Hines, and the Village of Mariemont moved for summary judgment. R. 35 (Mot. for Summ. J.) (Page ID #923). They argued that Rennie and Pittsley were entitled to qualified immunity, Bender did not have a viable *Monell* claim against the Village of Mariemont, and Bender's failure-to-train or failure-to-supervise claim against Hines failed. *Id.* at 8–18 (Page ID #930–40). The district court granted the motion as to Hines and the Village of Mariemont but denied the motion as to Pittsley and Rennie. *Bender v. Village of Mariemont*, No. 1:23-CV-51, 2025 WL 1735764, at *13 (S.D. Ohio June 23, 2025).

The district court concluded that Bender held legal title to the condo as trustee, so "Bender's residing in the condo after Cole's death could perhaps be understood as her undertaking an unwritten lease agreement with herself, serving as both lessor (in her capacity as trustee) and lessee (in her personal capacity)." *Id.* at *6–7. Even though that transaction may have constituted self-dealing by Bender as trustee, which Ohio law generally prohibits, such self-dealing would have made the transaction only voidable, not void. *Id.* Because Kevin Surette had taken no action to void the transaction, Bender had a possessory interest in the condo. *Id.*

The district court then concluded that, "[o]n Bender's telling" of what occurred in the condo, the Officers "t[ook] an active role in the . . . eviction" and were not there merely to keep the peace. *Id.* at *8 (quoting *Middaugh v. City of Three Rivers*, 684 F. App'x 522, 527 (6th Cir. 2017)). The district court highlighted that "Officers Rennie and Pittsley: (1) asked [Kevin]

Surette when he wanted Bender out of the condo; (2) 'forced' her out when [Kevin] Surette answered 'today'; (3) and threatened her 'at least ten times' with jail time if she didn't comply." *Id.* The seizure was unreasonable under *Cochran v. Gilliam*, 656 F.3d 300 (6th Cir. 2011), where we held that the deputies violated the Fourth Amendment despite "far less plaintiff-friendly . . . facts." *Id.* In *Cochran*, the deputies "were prompted to act by a facially valid judgment of eviction," which "they closely read." *Id.* "Moreover, the *Cochran* defendants took the further step of conferring with an attorney to confirm their authority to seize the tenant's personal property." *Id.* In contrast to *Cochran*, "[t]he Officers here made no such inquiry [into Kevin Surette's authority to evict Bender], admitting to giving [Kevin] Surette's purported 'estate documents' at best a cursory review," and made no "further inquiry" into Kevin Surette's authority. *Id.* The district court concluded that "if the *Cochran* defendants' actions didn't pass muster under the Fourth Amendment's 'reasonableness' standard, the Officers' actions here, under Bender's version, do not either." *Id.*

Finally, again relying on *Cochran*, the district court held that the right was clearly established. *Id.* at *9. The district court noted that *Cochran* made clear that "where a person's claim to have a right to evict someone from a residence rests exclusively on the purported effect of legal documents (the eviction judgment in *Cochran* or [an] estate document here), the Officers must at least (1) closely read the document purporting to vest them with authority to seize the property at issue, and (2) enlist the aid of an attorney, at the very minimum, to confirm that their understanding of the document is correct." *Id.* Pittsley and Rennie timely filed a notice of appeal. R. 47 (Notice of Appeal) (Page ID #1320).

## II. JURISDICTION

We have jurisdiction to review a district court's denial of qualified immunity at summary judgment under the collateral-order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). Our "jurisdiction regarding [such] orders . . . , however, is narrow." *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008). Review "is limited to 'only purely legal questions.'" *Gordon v. Bierenga*, 20 F.4th 1077, 1081 (6th Cir. 2021) (quoting *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019)). A defendant seeking interlocutory review "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets

forth a 'genuine' issue of material fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). "[T]o the extent that the denial of qualified immunity is based on a factual dispute, [it] falls outside of [our] narrow jurisdiction." *Harrison*, 539 F.3d at 517. "This limitation ensures that" our review "remains confined to the denials of qualified immunity and does not bleed over into a review of district courts' evaluation of genuine disputes of material fact." *Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016).

Where a denial of qualified immunity is based on a factual dispute, a defendant may nonetheless "invoke [our] jurisdiction by conceding the plaintiff's version of the facts." *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024). A defendant's failure to concede the plaintiff's version of the facts generally deprives us of jurisdiction. *Sabo v. City of Mentor*, 657 F.3d 332, 336 (6th Cir. 2011). If, however, a defendant disputes only facts that are minor and "immaterial to the legal issues raised by the appeal," we retain jurisdiction. *Gillispie v. Miami Township*, 18 F.4th 909, 917 (6th Cir. 2021) (quoting *Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020)).

Here, the Officers generally concede Bender's version of the facts in their arguments, even though they omit facts that are favorable to Bender. Despite this, Bender points to several "facts" that the Officers fail to concede to argue that we lack jurisdiction. Appellee Br. at 8–9. But the contested facts that Bender points to are either immaterial or are questions of law, not fact. For example, Bender argues that the Officers fail to concede that she had a possessory interest in the condo. *Id.* at 8. But here that is a question of law, not fact. Next, Bender points out that the Officers describe the 2015 will Kevin Surette presented to the Officers as "valid." *Id.* at 9; Appellants Br. at 21. But that is immaterial, because even if the will were valid, it would not absolve the Officers of potential liability, for the reasons detailed below in Part III.B.3. The same is true of Bender's contention that the Officers continue to argue that they believed that they went to the condo to maintain the peace. Appellee Br. at 8–9. The Officers' subjective beliefs that they went to the property to maintain the peace are immaterial to whether their conduct violated the Fourth Amendment, because the Fourth Amendment analysis turns on the objective circumstances at the time of the seizure, not on subjective intentions or opinions. *Hensley v. Gassman*, 693 F.3d 681, 693 (6th Cir. 2012); *see generally Torres v. Madrid*, 592 U.S.

306, 317 (2021); *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010). In the end, we have jurisdiction because the few facts that the Officers dispute are immaterial.

## III. ANALYSIS

### A. Legal Framework

We review de novo "the denial of summary judgment on grounds of qualified immunity." *Cochran*, 656 F.3d at 305 (quoting *McCloud v. Testa,* 97 F.3d 1536, 1541 (6th Cir. 1996)). Officers sued in their individual capacities are "entitled to qualified immunity if 'a reasonable officer could have believed [their actions] to be lawful, in light of clearly established law and the information the . . . officer[] possessed.'" *Hensley*, 693 F.3d at 687 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). To determine whether officers are entitled to qualified immunity, we engage in a two-step inquiry. *Howell v. McCormick*, 148 F.4th 834, 843 (6th Cir. 2025). "At step one," *id.*, we determine "whether the facts, viewed in the light most favorable to the plaintiff, show a violation of a constitutional right," *Cochran*, 656 F.3d at 306. "At step two" we must determine whether it was "clearly established" at the time of the violation that the defendant's conduct violated the Constitution. *Howell*, 148 F.4th at 843. We "ha[ve] discretion to decide . . . the order of the analysis." *Hensley*, 693 F.3d at 687. We begin with step one here.

### B. Step One: Constitutional Violation

The Fourth Amendment prohibits unreasonable seizures. *Hensley*, 693 F.3d at 687–88. To show that the Officers' participation in an otherwise private eviction constituted an unreasonable seizure in violation of the Fourth Amendment, Bender must show three things. First, there must have been "some meaningful interference with [her] possessory interests in th[e condo]." *Id.* at 688 (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)). Second, the Officers must have actively participated in evicting her from the condo or chilled her right to object, because "a police officer's presence during a [private] repossession solely to keep the peace . . . is alone insufficient to convert the repossession into state action." *Id.* at 689. Third, the seizure must have been unreasonable, *id.* at 692, which is "particularly" likely "when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance," *Cochran,* 656 F.3d at 308. We analyze each of these factors in turn.

### 1. Possessory Interest[3]

We look to Ohio law to determine whether Bender has a "[p]ossessory interest[]" in the condo. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 141 F.4th 796, 810 (6th Cir. 2025).[4]  Under Ohio law, Bender held legal title to the condo as trustee of Cole's living trust. *Goralsky v. Taylor*, 571 N.E.2d 720, 722 (Ohio 1991).  Bender's authority as trustee was governed by the terms of the trust and background principles of Ohio law.  *In re Binder's Est.*, 27 N.E.2d 939, 949 (Ohio 1940); *Biddulph v. DeLorenzo*, No. 83808, 2004 WL 1902725, at *3 (Ohio Ct. App. Aug. 26, 2004).  The trust documents provided that Bender, as trustee, could "exercise all such rights and privileges as could be done, taken, or exercised by an owner of the Trust property."  R. 41-11 (Rita M. Cole Living Trust Agreement at 4) (Page ID #1166).  Bender was also permitted "[t]o sell, convey, exchange, convert, improve, repair, manage, operate, and control Trust property" and "[t]o lease" the property.  *Id.* at 3 (Page ID #1165).  Therefore, under the terms of the trust, Bender could occupy the condo or lease it to herself in her individual capacity.

Background Ohio law, however, prohibits trustees from self-dealing with trust property except as "authorized by the terms of the trust."  Ohio Rev. Code Ann. § 5808.02(B).  Critically, self-dealing acts are "*voidable* by a [trust] beneficiary."  *Id.* (emphasis added).  "A voidable act takes effect as intended, and continues to be effectual . . . until it is set aside or nullified as to all or some part of the persons or things which were affected by it."  *In re Est. of Gavrilovich*, No. 10718, 1982 WL 2808, at *2 (Ohio Ct. App. Oct. 27, 1982) (per curiam) (citation modified).  In contrast, a "void" act is treated "as if it never existed."  1 *Williston on Contracts* § 1:20 (4th ed.).  Voidable transactions must be rescinded by a successor trustee or timely challenged in court by the trust beneficiaries in order to invalidate or set aside the transaction.  Ohio Rev. Code Ann. § 5808.02(B)(3); *Cleveland Tr. Co. v. Eaton*, 256 N.E.2d 198, 207 (Ohio 1970).  Absent such

---

[3]The parties do not dispute that, if Bender had a possessory interest in the condo, evicting her meaningfully interfered with that interest.

[4]There is debate as to whether looking to state law is the correct approach.  *See, e.g.*, Danielle D'Onfro & Daniel Epps, *The Fourth Amendment and General Law*, 132 Yale L.J. 910 (2023).  We have already adopted this state-law approach, however, so we adhere to it here.  Additionally, this case does not present the complexities that could arise if the state attempted to "sidestep" constitutional protections "by disavowing traditional property interests long recognized under state law."  *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998).

action, the transaction remains in force.  Kevin Surette and the other trust beneficiaries did not challenge Bender's residence in the condo before the May 6 eviction.  *See* R. 33 (Kevin Surette Dep. at 51:6–14, 54:15–22) (Page ID #724, 727).  Therefore, even assuming that Bender's use of the condo was not authorized by the terms of the trust and was prohibited self-dealing, Bender had a voidable property interest in the condo at the time of the eviction in addition to legal title.

A voidable interest in property, even absent legal title, creates a possessory interest that is cognizable under the Fourth Amendment.  *Sanders v. City of San Diego*, 93 F.3d 1423, 1427 n.3 (9th Cir. 1996); *cf. United States v. Thomas*, 65 F.4th 922, 924 (7th Cir. 2023).[5]  And, despite the Officers' argument to the contrary, Appellants Br. at 13, Bender's possessory interest in the condo is protected by the Fourth Amendment even though Bender also owned her own home where she received mail.  *Mockeridge v. Harvey*, 149 F.4th 826, 834 (6th Cir. 2025) ("A person does not lose Fourth Amendment protection by not continuously occupying a house or by owning multiple houses. . . . [T]he Fourth Amendment [does not] 'limit its protection to a single house or home.'" (quoting *Roberson v. United States*, 165 F.2d 752, 754 (6th Cir. 1948))).  If "[a] hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,'" *Lanza v. New York*, 370 U.S. 139, 143 (1962), so may the condo where Bender had resided on most nights for years.  We hold that Bender had a possessory interest in the condo at the time of the eviction.

## 2. Active Participation

Next, Bender must show that the Officers actively participated in evicting her or chilled her ability to object to the eviction.  "[A] police officer's presence during a repossession solely to keep the peace, i.e., to prevent a violent confrontation . . . is alone insufficient to convert the repossession into state action."  *Hensley*, 693 F.3d at 689.  So, for example, an officer who merely accompanies a private party, remains in their parked car around the corner while the third

---

[5]In *United States v. Johnson*, the Tenth Circuit held that there was no reasonable expectation of privacy in a storage unit when the defendant "fraudulent[ly] and criminal[ly]" entered into the lease using a stolen identity, which resulted in the contract being voidable under state law.  584 F.3d 995, 1001–04 (10th Cir. 2009).  But *Johnson* is distinguishable on at least three grounds.  First, there are no allegations that Bender engaged in fraudulent or criminal activity.  Second, the question here is not whether Bender had a reasonable expectation of privacy—it is whether she had a possessory interest in the condo.  And finally, *Johnson* involved a storage unit, not a "residential premises" like the condo, and "courts have distinguished between searches of residential premises, searches of business premises, searches of vehicles, and searches of other places and effects."  *Id.* at 1004 n.9.

party repossesses the property, and does not encourage or direct the repossession in any way does not "convert the repossession into state action." *United States v. Coleman*, 628 F.2d 961, 963–64 (6th Cir. 1980). "[W]hen officers take a more active role in the repossession," such as by "active[ly] interven[ing] [on behalf of] and assist[ing]" the private party, it converts the repossession into state action that can give rise to liability under § 1983. *Hensley*, 693 F.3d at 688–89. "Even without active participation, . . . an officer's conduct can facilitate a repossession if it chills the plaintiff's right to object." *Id.* at 689. Officers' conduct chills the plaintiff's right to object when their "arrival and close association with the [private party] during the repossession . . . signal[s] to the [plaintiff] that the weight of the state is behind the repossession and that the [plaintiff] should not interfere by objecting." *Id.* at 690.

A few cases are illustrative of when an officer's conduct converts a private repossession into state action. In *Cochran*, Cochran's landlords had obtained a valid judgment of eviction from a court and a valid warrant for possession that allowed the sheriff to evict Cochran from the home and return it to the landlords. 656 F.3d at 303. The landlords arrived at the home with the deputies, and after carefully reviewing the warrant for possession, the deputies "realized that it was silent as to Cochran's personal property located at the premises." *Id.* So they told the landlords to "secure Cochran's personal property" so that Cochran could "take it following the eviction" because Cochran was not currently at the home. *Id.* The landlords informed the deputies "that the Lincoln County Attorney had told [them] that Cochran's personal property could be sold to recover [their] losses." *Id.* The deputies "then contacted the county attorney" who told them "that [the landlords] had a 'right to sell the property.'" *Id.* The landlords then "removed Cochran's personal property from the residence." *Id.* At that point, Cochran arrived at the scene, and the deputies "threatened to restrain and/or arrest anyone who attempted to interfere with the [landlords'] procurement of Cochran's personal property" despite Cochran's protests and attempts to stop the landlords from taking the property. *Id.* at 304. The deputies were present for the removal of Cochran's property, they personally carried out and loaded some of the property into the landlords' truck, and one of the deputies purchased a TV from the landlords. *Id.* at 304–05. We held that those actions were sufficient to show that the deputies actively participated in the repossession of Cochran's property.

In *Middaugh*, a third party contacted the police regarding repossessing a car. 684 F. App'x at 524. She told the officers that she was divorcing her husband and "that her attorney had advised her to get the [car] titled in her name and to ask the police to provide security while she retrieved the vehicle from" the house of the plaintiff[6] (her brother-in-law). *Id.* at 525. The third party showed the officers her key to the car and "a copy of a document entitled 'Application for Michigan Vehicle Title' that she had obtained from the Secretary of State earlier that day." *Id.* One officer drove the third party to the plaintiff's home and parked his patrol car between the house and the car. *Id.* The other officer parked nearby. *Id.* The third party then got into the car and drove it away. The plaintiff was home and "noticed the patrol cars pulling up, but because of the way the patrol cars were parked [the plaintiff] could not see anyone getting into the [car]" and did not exit the home while the officers were there. *Id.* We held that the officers participated in the seizure of the plaintiff's car because they drove the third party to the property and positioned their car, and themselves, between the plaintiff and car so that they blocked the plaintiff's view of the car and third party. *Id.* at 528.

The Officers' conduct here is far more indicative of state action than the conduct in *Middaugh* and is akin to the actions in *Cochran*. As in *Cochran*, the Officers accompanied Kevin Surette to the condo. R. 32 (Rennie Dep. at 31:15–18) (Page ID #641). Once there, the Officers "pushed their way into the condo" without Bender's consent and told her that she "ha[d] ten minutes" to gather her belongings and exit the condo. R. 27 (Bender Dep. at 93:9–10, 94:16–23) (Page ID #378–79). Rennie threatened to arrest Bender multiple times during the eviction, as in *Cochran*. *Id.* at 102:9–19, 106:1–25 (Page ID #387, 391). Pittsley told Bender to "[g]ive [him] [her] key" to the condo and "took [her] key." *Id.* at 122:20–123:14, 125:19–126:1 (Page ID #407–08, 410–11). Ultimately the Officers "threw [Bender] out of the condo," "pushed [her] out the door," and left the condo only after doing so. *Id.* at 122:20–25, 124:18–22, 150:2–20 (Page ID #407, 409, 435).

In contrast with the facts here, the officers in *Middaugh* merely drove the third party to the premises and positioned themselves to block the plaintiff's view of the car and third party.

---

[6]There were multiple plaintiffs in *Middaugh*, but for simplicity, we refer to only one.

684 F. App'x at 528.  And even though the Officers here did not carry any of the property out of the condo as they did in *Cochran*, Bender claims that her eviction constituted a seizure, not that her personal property was seized.  The Officers personally threw Bender out of the condo and took her key; thus, as a direct result of their actions, she could not access the property and was deprived of her possessory interest.  That is analogous to the deputies in *Cochran* carrying the plaintiff's personal property out of the home, which likewise directly deprived Cochran of his possessory interest.  On Bender's account of what occurred, she has easily shown that the Officers actively participated in evicting her and thereby converted the eviction into state action.[7]

Our sibling circuits' cases addressing whether officers engaged in state action in the context of private repossession further support our conclusion that Bender has demonstrated that the Officers actively participated in the seizure.  In *Harvey v. Plains Township Police Department*, the Third Circuit held that an officer engaged in state action in a repossession when the officer directed the landlord to open the door to the apartment that contained the property at issue.  421 F.3d 185, 190–91 (3d Cir. 2005).  And the Ninth Circuit in *Harris v. City of Roseburg*, held that an officer actively participated in a repossession when the officer positioned himself between the plaintiff and the property, told the plaintiff to move away from the property, and told the plaintiff that if he interfered, he would be arrested.  664 F.2d 1121, 1127 (9th Cir. 1981); *see also Abbott v. Latshaw*, 164 F.3d 141, 147 (3d Cir. 1998) (holding that a jury could find an officer engaged in state action when he "advised [the third party] that she had a right to immediate possession of the" property, "ignored . . . ardent protest [against] the seizure, and threatened to arrest [the plaintiff's attorney] if he did not move his car to make way for" the third party to seize the property); *Marcus v. McCollum*, 394 F.3d 813, 821–23 (10th Cir. 2004) (holding that a jury could find officers engaged in state action when the plaintiffs objected to the

---

[7]The Officers argue that Bender did not "attribute any comments or activity to Pittsley while in the residence."  Appellants Br. at 14–15.  The Officers did not raise this argument below, so it is forfeited.  R. 35 (Mot. for Summ. J.) (Page ID #923–43); *Fam. Serv. Ass'n ex rel. Coil v. Wells Township*, 783 F.3d 600, 605 (6th Cir. 2015).  And Bender *did* attribute specific conduct to Pittsley.  Bender testified that *both* Officers pushed their way into the condo and "pushed" her out the door before they left the condo, that Pittsley took and retained her key to the condo, and that Pittsley cited her for disorderly conduct.  R. 27 (Bender Dep. at 108:23–109:2) (Page ID #393–94); R. 31 (Pittsley Dep. at 90:5–13) (Page ID #600); R. 27-4 (Incident Report at 2) (Page ID #490).  Therefore, Pittsley was personally involved in the seizure, not merely present at the scene.  *See Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984).

repossession before the officers arrived and stopped doing so only "after the police intervention" which included "the officers repeatedly t[elling] [the plaintiffs] to allow [the third party] to take possession of the automobile and threaten[ing] them with arrest if they continued to resist"); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1106, 1116–18 (10th Cir. 2008) (holding that a jury could find the officer engaged in state action when the officer, although not present at the scene of the seizure, informed the plaintiff when she called the police that the third party had a right to the property and that if the plaintiff went to the property to try to stop the repossession, the officer "would arrest her").  Some of our sibling circuits have even concluded that a uniformed officer's mere arrival with the third party and proximity to them throughout the repossession is sufficient to create a genuine dispute of material fact as to whether they actively participated in the seizure. *Jones v. Gutschenritter*, 909 F.2d 1208, 1212–13 (8th Cir. 1990); *see also Booker v. City of Atlanta*, 776 F.2d 272, 274 (11th Cir. 1985) (per curiam) (holding that a jury could find that an officer engaged in state action when he "arrived with the repossessor" which "gave the repossession a cachet of legality and had the effect of intimidating [the plaintiff] into not exercising his right to resist, thus facilitating the repossession").  That is far less than the Officers' conduct here, where they told Bender she had ten minutes to leave the condo, threatened to arrest her, pushed her out the door, and took her key.

### 3. Reasonableness

Finally, the Officers' conduct must have been unreasonable to violate the Fourth Amendment.  We have made clear that "the existence of a court order . . . is a game-changer" "[o]n the issue of reasonableness." *Hensley*, 693 F.3d at 692 (citing *Soldal*, 506 U.S. at 71). Officers are "particularly" likely to violate the Fourth Amendment "when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's interest would outweigh the individual's interest in his property." *Cochran,* 656 F.3d at 308.  In the absence of a court order or exigency, we have held that seizures were unreasonable when the third party had non-official documentation to support their right to repossess the property and even when officers received advice from the county attorney that the third party had a right to the property. *See Hensley*, 693 F.3d at 692; *Cochran,* 656 F.3d at 308–09.  Additionally, legal process is required to evict someone from a residential property under

Ohio law even if the person no longer has a right to the property—self-help evictions are not permitted. *See* Ohio Rev. Code Ann. §§ 5321.15(A), 2323.07, 5303.03; *Gvozdanovic v. Woodford Corp.*, 742 N.E.2d 1145, 1159 (Ohio Ct. App. 2000); *Witkowski v. Arditi*, 702 N.E.2d 1231, 1233 (Ohio Ct. App. 1997); *Bank One, Cincinnati v. Wait*, 674 N.E.2d 752, 756 (Ohio Ct. App. 1996); *Wallace v. City of Rossford*, No. WD-17-061, 2018 WL 3203145, at *6 (Ohio Ct. App. June 29, 2018).

It is undisputed that the Officers knew that Kevin Surette did not have a court order and they do not contend that exigent circumstances justified the eviction. Against that backdrop, two of our cases clearly show that the Officers' conduct was unreasonable. In *Hensley*, a third party contacted the deputies and asked if they would come to the scene while he repossessed the plaintiff's car. 693 F.3d at 684. The deputies met the third party and "followed him" to the plaintiff's[8] residence. *Id.* The third party "told the [d]eputies that he had a repossession order and showed them a file containing some documents." *Id.* The [d]eputies did not read the documents," which were only a private "order from the creditor to [the third party] to repossess the vehicle," not a court order. *Id.* at 684, 694. The third party pulled his tow truck into the driveway where the car was located, and the plaintiff came to the driveway. *Id.* at 684. The plaintiff then "stood between the [car] and the tow truck to prevent [the third party] from hooking up the [car]" and told the deputies and the third party that "they could not take the vehicle and had to leave the property" because the car "payments were up to date and the car was not supposed to be repossessed." *Id.* at 685. The deputies "responded that [they] did not care," "they were not going to leave[,] and that [the third party] was taking the [car]" and told the plaintiff "to step out of the way." *Id.*

The plaintiff then got into the car while the third party was still attempting to hook it up to the tow truck. *Id.* The deputies "ordered" the plaintiff to exit the car, and when the plaintiff did not comply, the deputies shouted and threatened to break the car's window. *Id.* The plaintiff then began to drive the car away, despite the fact that it was chained to the tow truck, so the car began "pulling the tow truck" towards the third party who was "on the ground next to the rear

---

[8]*Hensley* involved multiple plaintiffs, but for purposes of simplicity, we refer to only one.

wheels of the [car]." *Id.* Once the car was fully hooked up to the tow truck, the deputies "told [the third party] to pull it out of the driveway and into the road." After the car "was parked on the road," the deputies "ordered [the plaintiff] several times to exit the vehicle" and when she failed to comply, the deputy "used a hammer to break the passenger-side window" and "pulled [her] from the car." *Id.*

We held in *Hensley* that if a trier of fact accepted the following facts, they "could certainly conclude that the seizure was unreasonable":

> the [d]eputies knew that: (1) the repossession was a private civil matter; (2) [the third party] claimed that he was authorized to repossess the [car]; (3) [the plaintiff] disputed [the third party's] authority to take the [car] and gave a specific reason why the repossession should not occur; and (4) the [d]eputies lacked any evidence substantiating [the third party's] claim of authority to repossess the [car].

693 F.3d at 684, 692. We explained that even if the deputies read and relied on the document the third party had provided, the reliance "would not have been reasonable, because [the document] was simply an order from the creditor to [the third party] to repossess the vehicle" so it "carried no more weight than [the third party's] own word which, in the context of this private repossession, the [d]eputies could not accept over [the plaintiff's] competing claim." *Id.* at 694.

The deputies in *Hensley* also took additional actions, such as breaking the car's window and "extract[ing] . . . [the plaintiff] from the vehicle after the immediate threat of injury had passed," which we described as "manifestly unreasonable." *Id.* at 692–93. But prior to discussing those facts, we had already concluded that if a reasonable trier of fact accepted the plaintiff's version of the facts, they "could certainly conclude that the seizure was unreasonable" based on only the four factors discussed above. *Id.* at 692. Our discussion of the additional facts, therefore, was just icing on the cake in further support of our conclusion that the deputies' conduct was unreasonable.

And, in *Cochran* we held that deputies committed an unreasonable seizure when they acted on the basis of a court order that did not cover Cochran's personal property. The deputies closely reviewed the court order and became aware of that fact, so the landlords and the deputies "contacted the county attorney" regarding Cochran's personal property "and w[ere] told that [the landlords] had a 'right to sell the property.'" *Cochran*, 656 F.3d at 303, 308. We concluded that

"[i]t [was] not reasonable for the [deputies] to oversee and personally assist the [l]andlords in taking possession of Cochran's belongings when there was no apparent legal basis for such action." *Id.* at 309.

The Officers argue that *Cochran* is distinguishable because the deputies in that case "knew the property belonged to the tenant." Appellants Br. at 18. But the county attorney in *Cochran* allegedly informed the deputies and the landlords "that the [l]andlords had a right to sell [Cochran's personal] property" to "recover some of the losses from the eviction." *Cochran*, 656 F.3d at 308–09. The deputies on the scene could have interpreted the attorney's advice as meaning that the landlords had a legal right to the seized property. Therefore, even though it was clear at the time of litigation that the plaintiff owned the property at issue, at the time of the seizure the deputies in *Cochran* may well have believed that the parties had competing interests in the property. And despite that, we still held that the seizure was unreasonable.

Finally, in *Revis v. Meldrum*, a third party had "obtained a money judgment in a . . . lawsuit from a . . . court" and "two writs of execution for [the plaintiff's] real and personal property . . . to satisfy the judgment." 489 F.3d 273, 276 (6th Cir. 2007). The deputy sheriff accompanied the third party to execute the judgment and instructed "private contractors" to seize the plaintiff's "personal property and change[] the locks on his residence." *Id.* We held that the seizure was unreasonable in violation of the Fourth Amendment even though the third party had a state-court judgment of execution for the plaintiff's property, which the deputy sheriff reviewed and sought legal advice on from the county attorney, because "under Tennessee law, the writ of execution for [the plaintiff's] residence commanded [the deputy sheriff] only to give notice that the property was subject to sale," not to evict the plaintiff. *Id.* at 277, 287. We rejected the deputy sheriff's argument that the seizure was reasonable under *Soldal*, 506 U.S. at 71, because of the state-court judgment, reasoning that "*Soldal* simply begs the question of whether the court's writ of execution in this case entitled [the deputy sheriff] to evict" the plaintiff under state law. *Id.* at 287.

Our sibling circuits have reached similar conclusions. In *Hansen v. Cannon*, the Seventh Circuit held that the officers engaged in an unreasonable seizure when a court order allowed a third party to seize property on one lot owned by the plaintiffs, but did not mention the adjacent

lot that was also owned by the plaintiff.  122 F. App'x 265, 270–71 (7th Cir. 2004) (Order).  The third party nevertheless seized property from the adjacent lot, despite the plaintiffs' eventual protests and the lack of a court order.  *Id.* at 267, 272.  The Seventh Circuit held that the seizure violated the Fourth Amendment because there was no court order for the adjacent lot and there was evidence that would have alerted the officers that the lots were distinct.  *Id.*  at 270–72.  In *Marcus*, the Tenth Circuit held that the officer committed a seizure in violation of the Fourth Amendment when he actively participated in the seizure of a car, in violation of state law, based on only the third party's claim that he had a right to repossess the car and his document with a VIN number that matched the VIN on the car over the plaintiff's objections.  394 F.3d at 816, 823; *see also Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 611 (3d Cir. 2011) (holding that "a reasonable jury could have found that [the officer]" violated the Fourth Amendment when there was no court order authorizing the seizure and the officer "unreasonably recognized [the third party's] documentation—a letter prepared by [the third party's] attorney purporting to list all the items which belonged to [the third party]" even though the plaintiff was not there to contest ownership).

*Hensley*, *Cochran*, and *Revis* establish that the seizure in this case was unreasonable.  The Officers knew that there was no court order covering the relevant property and that the eviction was a private civil matter, as in *Hensley* and *Cochran*.  Viewing the facts in the light most favorable to Bender, as we must, a trier of fact could conclude that reasonable officers would have understood that ownership of the condo was disputed, as in *Hensley*.  Bender asked to see a warrant and told the Officers that they needed one to enter the condo.  R. 27 (Bender Dep. at 101:8–20) (Page ID #386).  That could indicate to reasonable officers that Bender believed she had a possessory right to the condo, because the average person would generally not demand a warrant to enter a residence in which they had no interest.  Bender also asked to see the will that Kevin Surette had shown the Officers and told the Officers that she "kn[e]w [Cole's] last will was" executed in 2021 and that she "had the only true will."  *Id.* at 101:16–102:1 (Page ID #386–87).  Those statements could reasonably be interpreted as showing that Bender claimed an interest in the condo and disputed Kevin Surette's claim.  When viewed together, a trier of fact could conclude that at the time of the seizure reasonable officers would have known that Bender

believed and asserted that she had a right to the property and that Kevin Surette did not have any right to it.

In *Hensley*, exactly as here, the third party told the officers that he had a right to repossess the property and private documentation to confirm it, but otherwise the officers "lacked any evidence substantiating [the third party's] claim of authority to repossess the" car. 693 F.3d at 692. Here, even though the Officers saw that Kevin Surette's name was in the will, they otherwise did not read or inspect the will. R. 32 (Rennie Dep. at 24:14–19) (Page ID #634). They did not even read the first page of the document to confirm if Kevin Surette was the executor as he claimed to be, let alone read it thoroughly enough to realize that the will did not mention the condo at all. *Id.*; R. 41-11 (2015 Will at 1–9) (Page ID #1179–87). That makes the Officers' conduct even more unreasonable than *Revis* and *Cochran*—where the deputies carefully read the court order and sought advice from the county attorney—yet we still held that those seizures were unreasonable. Additionally, as in *Revis*, the Officers had no authority under state law to evict Bender because, as explained above, legal process is required to evict someone from a residential property under Ohio law—self-help evictions are not permitted. The lack of legal authority to evict Bender absent legal process contributes to our conclusion that the Officers' conduct was unreasonable.

In the end, just like in *Hensley*, the Officers could not accept Kevin Surette's claim to the condo "over [Bender's] competing claim." 693 F.3d at 694. The Officers were presented with sufficient reason to doubt Kevin Surette's claim to the property—and yet decided to participate in the seizure anyway. Ultimately, because a reasonable trier of fact could conclude that the Officers knew there was no court order authorizing the eviction, knew the ownership of the property was disputed, and did not otherwise investigate Kevin Surette's claim (or even read the will), their conduct was unreasonable.

Our holding does not require officers simply to do nothing when presented with a dispute over who owns the property. Officers may, of course, be present at the scene of the dispute to keep the peace and take actions "in furtherance of their legitimate peacekeeping function." *Hensley*, 693 F.3d at 692. This is precisely because, as the dissent states, conflict in such situations is common so officers' presence can be important to prevent violence. Our holding

does nothing to disturb this longstanding rule and therefore we do not place officers in some "Catch-22" where they may be unable to "prevent a tragedy" as the dissent suggests. Had the Officers here limited their conduct to legitimate peacekeeping, they would not have violated the Fourth Amendment. But being present to keep the peace is different than actively participating in the seizure, and here the Officers crossed that line.

In addition to officers' ability to be on the scene to keep the peace, exigent circumstances may, of course, justify conduct that otherwise would be unreasonable. For example, if a person told an officer that someone stole their car and was driving away in it, officers could respond in a way that is tailored to the scope of the exigency, such as by briefly seizing the car to investigate. But, in cases where there are no exigent circumstances and officers actively participate in the seizure, they may not credit one party's claim to the property over the other's without making any effort to confirm that there is a valid legal basis for the eviction.

## C. Step Two: Clearly Established

The Officers argue that even if they violated the Fourth Amendment, their conduct did not violate clearly established law. Appellants Br. at 15–24. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [the] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Hodges v. City of Grand Rapids*, 139 F.4th 495, 504 (6th Cir. 2025) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The right cannot be defined at too high a level of generality, so "general propositions of law are generally (though not always) insufficient to clearly establish a right." *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021). But "[w]e do not require a case directly on point," *Hodges*, 139 F.4th at 504 (quoting *al-Kidd*, 563 U.S. at 741), or "on all fours with the instant fact pattern to form the basis of a clearly established right," *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023) (quoting *Rhodes*, 10 F.4th at 679).

Instead, there must be "a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Rhodes*, 10 F.4th at 679). In other words, "the specific conduct need not have been found

unconstitutional" as long as "existing precedent . . . placed the . . . constitutional question beyond debate." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015) (citation modified). Existing precedent can make "an action's unlawfulness . . . apparent [via] direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 283 (6th Cir. 2020) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)); *see Baynes*, 799 F.3d at 612.

Caselaw predating Bender's eviction made it abundantly clear that the Officers violated Bender's Fourth Amendment rights. First, existing precedent clearly established that the Officers' actions crossed the line from mere presence at the scene to active participation in the eviction. For example, in *Cochran* we held that deputies actively participated in the repossession of Cochran's property when they arrived with the landlords, "threatened to restrain and/or arrest anyone who attempted to interfere with the [landlords'] procurement of Cochran's personal property," removed some of Cochran's property themselves, placed the property on a truck, and purchased one of Cochran's TVs. 656 F.3d at 304–05, 308. Just like in *Cochran*, the Officers here arrived with Kevin Surette and threatened to arrest Bender. R. 27 (Bender Dep. at 102:9–19, 106:1–25) (Page ID #387, 391).

Even though the Officers did not carry property out of the condo, they told Bender that she had ten minutes to exit the condo, took her key to the condo, pushed her out the door, and left the condo only after she was forced to exit. Taking the key from Bender and pushing her out of the condo is analogous to the deputies carrying out personal property in *Cochran*—the Officers' actions directly deprived Bender of use of and access to the condo. Additionally, in *Cochran* we explained that *Soldal* "addressed a situation in which deputy sheriffs not only stood by to keep the peace during the repossession of a trailer home but played an active role in facilitating the wrongful repossession" by telling "Soldal they were there to prevent his interference in the repossession and by refusing to stop a legally questionable repossession by others." 656 F.3d at 307–08.

Our reasoning in *Hensley* further supports the conclusion that the law was clearly established. We explained that the following actions "were more than mere police presence and reflect[ed] circumstances other courts have found indicative of state action":

(1) the [d]eputies arrived at the [plaintiff's] residence with, and at the request of, [the third party]; (2) [the deputies] ordered [the plaintiff], at least once, to move from between the [car] and the tow truck, as [the plaintiff] was attempting to thwart the repossession; (3) the [d]eputies ignored [the plaintiff's] demands to leave the property; (4) [the deputies] told [the plaintiff] that [the third party] was taking the [car]; and (5) [the deputies] ignored both [the plaintiff's] protest and her explanation and told [the plaintiff] that [the third party] was still going to take the [car].

*Hensley*, 693 F.3d at 691. That is closely analogous to the Officers' actions here. It is certainly true that *Hensley* did not ultimately rest its conclusion on those factors alone; the facts of the case were "somewhat unique because, rather than dissuading [the plaintiff] from objecting, the [d]eputies' conduct prompted her to do so." *Id.* But our statement that those facts "were more than mere police presence and reflect circumstances other courts have found indicative of state action," *id.*, is the type of reasoning and "specific examples" that can support that it was clearly established that the Officers actively participated in the eviction, *Ouza*, 969 F.3d at 283.

Caselaw also made clear that the Officers' conduct was unreasonable in violation of the Fourth Amendment. We have long held "that state actors violate the Fourth Amendment by taking an active role in private evictions and repossessions when there is no apparent legal basis for such action." *Hensley*, 693 F.3d at 694 (first citing *Soldal*, 506 U.S. at 71; and then citing *Cochran*, 656 F.3d at 309). That means officers are "particularly" likely to "not [be] entitled to qualified immunity" for participation in a seizure "when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's interest would outweigh the individual's interest in his property." *Cochran*, 656 F.3d at 308.

In *Cochran*, we held that the seizure of Cochran's personal property was unreasonable in the absence of a court order permitting the seizure even though the deputies carefully read the court eviction order and saw that it addressed only the home, not Cochran's personal property. Upon realizing that, the deputies contacted the county attorney, who told the deputies and landlords that the landlords could seize and sell Cochran's property to recoup the eviction costs. *Id.* at 308–09. By contrast, the Officers here merely glanced at the will (they did not even read the first page of the will, let alone carefully read the whole document) and did not ask an attorney for advice on the legal basis of the seizure. We cannot see how *Cochran* would not

make it clear to reasonable officers in the Officers' position that their conduct was unreasonable when they failed to carefully read the will or contact an attorney for legal advice. As the district court aptly put it, "the *Cochran* defendants' actions were far *less* troublesome than Bender's account of the Officers' actions here, yet they still failed to pass constitutional muster," and thus "if the *Cochran* defendants' actions didn't pass muster under the Fourth Amendment's 'reasonableness' standard, the Officers' actions here . . . do not either." *Bender*, 2025 WL 1735764, at *8.

The Officers argue that *Cochran* does not clearly establish that their conduct was unreasonable because the deputies in that case "knew the property belonged to the tenant." Appellants Br. at 18. But the landlords and deputies in *Cochran* had been told by the county attorney that the landlords had a right to Cochran's personal property—the deputies were advised "that the [l]andlords had a right to sell the property" to "recover some of the losses from the eviction." *Cochran*, 656 F.3d at 308–09. While on the scene, reasonable officers in their position may well have understood that advice to mean that the landlords had a legal right to the seized property that took priority over Cochran's ownership. That is true even though it was clear at the time of the litigation that the plaintiff owned the property, because the information and circumstances at the time of the seizure is what is relevant for Fourth Amendment purposes. *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 617 (6th Cir. 2007). And despite this, we determined that the deputies' reliance on the advice was unreasonable.

Any gaps that *Cochran* may have left in the law regarding disputed ownership were filled by *Hensley*. In *Hensley*, we held that if a reasonable trier of fact accepted the plaintiff's version of the facts, they "could certainly conclude that the seizure was unreasonable" because the repossession was a "private civil matter," the third party repossessing the car "told the [d]eputies that he had a repossession order and showed them a file containing some documents" that were not a court order, and the officers knew that ownership of the car was disputed. 693 F.3d at 684, 688, 692. Therefore, *Hensley* clearly established that, absent an exigency, seizures of disputed property are unreasonable when officers lack a court order and only have evidence that is worth "no more weight than [the third party's] own word." *Id.* at 694. In fact, we even held that it was

clearly established that the officers "could not accept" the third party's claim of ownership "over" the plaintiff's claim. *Id.*

Here, a reasonable trier of fact could find that the Officers knew that the ownership of the condo was disputed, there was no court order authorizing the eviction, they did not thoroughly inspect the will to determine if Kevin Surette was in fact the executor or if the condo was listed in the will, and they were crediting Kevin Surette's claim over Bender's based on only his assertions. Those facts mirror the relevant factors we discussed in *Hensley* to support our conclusion that the conduct was "unreasonable." True, the deputies in *Hensley* took additional actions, such as breaking the car's window and "extract[ing] . . . [the plaintiff] from the vehicle after the immediate threat of injury had passed," which we described as "manifestly unreasonable." *Id.* at 692–93. But those additional facts were just the cherry on top of the conclusion we had already reached—if the jury accepted the plaintiff's version of the facts mentioned above, the conduct was unreasonable. Therefore, it was clearly established that the Officers' conduct here was unreasonable in violation of the Fourth Amendment.

Against this conclusion, the Officers cite *Howell*, 148 F.4th at 843. Appellants Br. at 18. In *Howell*, officers arrived at the home that Howell and a third party, Avila, shared as roommates after Avila called 911 and stated that "her 'crazy' and 'drunk' housemate[] had 'her' car in their 'garage' and was 'refusing to let her have it.'" *Id.* at 841. Avila also told the officers that Howell "had 'pointed a gun at [her] face.'" *Id.* After a confrontation with Howell that resulted in officers handcuffing him and placing him in a patrol car, some of the officers "accompanied Avila into the home to gather her belongings." *Id.* at 842. Avila then attempted to retrieve the car, and the officers helped Avila push the car out of the garage. *Id.* at 842, 851. The officers, however, did not push the car off Howell's property, so the car *remained* on his property "after the officers had left." *Id.* at 843. Avila returned on her own later and took the car off the property. In the litigation, Howell asserted that he owned the car and that the officers committed an unreasonable seizure.

We held that it was not clearly established that the officers violated the Fourth Amendment. *Id.* at 851. The panel noted that it "s[aw] much uncertainty over the controlling legal standards" that the "parties d[id] not address," and reasoned that *Cochran* did not clearly

establish that the officers violated the law for two reasons. *Id.* at 851–52. First, the deputies in *Cochran* "knew that the property belonged to [Cochran]," but in *Howell* Avila told the officers that she owned the car. *Id.* at 852. Second, in *Cochran* the deputies "helped the landlord[s] remove the property from the premises," but in *Howell*, the officers did not remove the car from Howell's property, and it remained there after the officers left. *Id.*

Despite the Officers' argument to the contrary, *Howell* does not demonstrate that the Officers' conduct here did not violate clearly established law for several reasons. To start, the second ground on which *Howell* distinguished *Cochran* is entirely inapplicable because, unlike in *Howell*, the Officers here completed the seizure themselves by forcing Bender out of the condo and taking her key before they left the premises. Turning to the first ground on which *Howell* distinguished *Cochran*, there are, again, important factual differences here. Howell did not tell the officers that he owned the car at the time of the alleged seizure or dispute Avila's claim to it in any way, so the officers were presented only with Avila's claim that she owned the car, which was not contested at the scene. And the officers knew that Avila lived at the plaintiff's home with him and had other personal belongings there, which was circumstantial evidence that could be viewed as supporting her claim that she owned the car.

In contrast with *Howell*, here a trier of fact could find that Bender's objection to the Officers' presence in the condo, requests to see a warrant, and statement that she had the only true will would have informed every reasonable officer that Bender had a basis to believe, and asserted, that she had an interest in the condo and Kevin Surette did not have any such interest. Additionally, Kevin Surette had no belongings in the condo, and there was no other circumstantial evidence supporting his right to it. Those factual differences make this case more akin to *Hensley* than to *Howell*. But, likely because the parties did not cite or discuss *Hensley*, the opinion in *Howell* did not cite *Hensley*. Yet, as shown above, *Hensley*, decided in 2012, provides answers to the relevant legal standards in this case that we described in *Howell* in 2025 as uncertain. For example, *Howell* questioned what officers are to do when they encounter a dispute over ownership of property. 148 F.4th at 851. *Hensley* provided the answer: without a court order, exigent circumstances, or evidence other than the third-party's own claims or

documents, officers may not participate in the seizure and credit one party's claim of ownership over the other.

The dissent disputes that Bender sufficiently contested ownership of the condo because she did not explicitly tell the Officers that she owned the condo. Dissent at 30. But in reaching this conclusion, the dissent resolves this genuine dispute of material fact in favor of the Officers, which we are not permitted to do in this posture. *See Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) ("[U]nder either prong [of the qualified-immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014))). As already explained, Bender has presented evidence that could reasonably be interpreted as showing that Bender claimed an interest in the condo and disputed Kevin Surette's claim. Bender asked the Officers to see a warrant and told them that they needed one to enter the condo, asked to see the will that Kevin Surette had shown the Officers, told the Officers that she "kn[e]w [Cole's] last will was" executed in 2021, and told the Officers that she "had the only true will." R. 27 (Bender Dep. at 101:8–102:1) (Page ID #386–87). Reasonable triers of fact could conclude that such conduct would indicate to all reasonable officers that Bender believed she had a possessory right to the condo because the average person would generally not demand a warrant to enter a residence in which they had no interest, state that they had the only true will, or request to see the documentation presented to officers that allegedly gave the third party a right to the property while providing information that, had the officers read the document at all, entirely undermined the third party's claim to the property.

True, a trier of fact may not be compelled to conclude that such actions were sufficient to show Bender disputed ownership of the condo. And if that is the case, then, as the dissent contends, the Officers will be entitled to qualified immunity. But the evidence presented here would allow the trier of fact to reasonably conclude that Bender disputed ownership. And if the trier of fact does, this ground on which the dissent attempts to distinguish our precedent from this case is inapplicable because the jury will have determined that Bender disputed ownership of the property just like the plaintiffs did in *Hensley* and *Cochran*, even if the plaintiffs in those cases did so with different verbal formulations. *See* Dissent at 30–31.

The Officers' final argument is that "even if Bender can show that [her] constitutional right has been violated[] and was clearly established," they are entitled to qualified immunity because they "reasonably misapprehend[ed] the law." Appellants Br. at 22–23 (citation modified). But there is no third "reasonableness" prong to the qualified-immunity analysis. The Supreme Court has "ma[d]e clear . . . that the test for qualified immunity has only two prongs— whether the defendant violated a constitutional right and whether the right at issue was clearly established; there is no separate 'objective unreasonableness' prong." *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). Therefore, the Officers' final argument is foreclosed by binding precedent.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of qualified immunity.

———————

**DISSENT**

———————

THAPAR, Circuit Judge, dissenting. Kevin Surette asked the police to keep the peace as he spoke to Mary Ann Bender about why she was living in his deceased aunt's condo. Two police officers watched Surette and Bender argue for an hour, then confiscated Bender's copy of the condo key. The majority now finds that these officers aren't entitled to qualified immunity because their actions violated Bender's clearly established Fourth Amendment rights.

But as we said last year, there's "much uncertainty over the controlling legal standards" when officers attend a private repossession. *Howell v. McCormick*, 148 F.4th 834, 841–43 (6th Cir. 2025). And, sure enough, the majority doesn't identify any binding precedent showing that these officers unreasonably seized the condo. That means any alleged constitutional violation wasn't clearly established.

These officers aren't legal experts, so they couldn't have known their actions supposedly violated Bender's rights. And that entitles them to qualified immunity. I respectfully dissent.

\* \* \*

To be clearly established, the contours of a constitutional right must be so "clear that *every* reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (emphasis added) (quotation omitted). This, in turn, means that existing precedent "must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). But our precedent does the opposite.

We concluded as much last year. In *Howell*, officers helped a woman repossess a car that they believed was hers—though it later turned out that title was unclear. 148 F.4th at 841–43. In that case, we assumed the plaintiff, not the repossessor, had rightful title, yet we still found the officers were entitled to qualified immunity. That's because "no legal principle . . . establishe[d] beyond doubt that the officers committed an unreasonable seizure" by participating in this

private repossession. *Id.* at 851 (cleaned up). In fact, after walking through many of the same cases the majority cites, we found "much uncertainty over the controlling legal standards." *Id.* If federal judges viewed the law as "uncertain[]" after careful analysis and with plenty of time to scour the Federal Reporters, there's no way the officers would've realized they were violating Bender's rights in the midst of a heated confrontation.

The majority argues that *Howell* doesn't apply because, in that case, the officers didn't know title to the car was contested (even though it was in the plaintiff's garage). But the officers here didn't know title to the condo was contested either. In fact, Bender *never* explained to the officers that she was the rightful owner of the condo. Instead of asserting title, Bender told the officers that she was staying at the condo while "getting back on her feet" after an illness. R. 27, Pg. ID 378. The only way she arguably contested title was by mentioning that she "had the only true will." *Id.* at 386. But rather than produce that will or explain why it was relevant to the ownership of the condo, she simply demanded Surette's copy of the 2015 will. So the officers saw only one document: the 2015 will that identified Surette as a beneficiary and didn't mention Bender. That means the officers didn't know Bender had a competing claim to title to the condo.

Indeed, the majority can't identify a single case that would've put the officers on notice that a vague request to see a warrant is enough to contest title. By contrast, in the Sixth Circuit cases that the majority does cite, the plaintiffs made it crystal clear to the officers that they were contesting title.[1] In one case, deputy sheriffs helped two landlords evict a tenant and take his personal belongings out of the home. *Cochran v. Gilliam*, 656 F.3d 300, 303–04 (6th Cir. 2011). The eviction order didn't mention the tenant's personal property, so the tenant, his neighbors, and his family members all called 911 and the state police to try to prevent deputies from taking his property. In another case, the owner of a mobile-home park enlisted officers' help to remove a trailer from his property. *Soldal v. Cook County*, 506 U.S. 56, 58 (1992). The trailer owner then tried to file a complaint for trespassing. Even though the officers "knew [the landlord] did not

---

[1]The majority relies heavily on cases from our sister circuits, as well as unpublished authority from our court. *See, e.g.*, Maj. Op. at 13, 14–15, 18–19. But rights are clearly established only when "existing precedent" places the constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741. And out-of-circuit cases and unpublished opinions aren't precedential, so they can't resolve debated questions. *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). That means they don't clearly establish anything.

have an eviction order and that [his] actions were unlawful," they assisted with the eviction anyways. *Id.* at 59. In both cases, the protestations created such substantial doubt about the seizure's legality that the officers called a lawyer. *Id.* at 58; *Cochran*, 656 F.3d at 303. And in a third case, officers tried to help a debt collector repossess a car. *Hensley v. Gassman*, 693 F.3d 681, 684 (6th Cir. 2012). The car owner's wife and son immediately explained they were up to date on their payments and "the car was not supposed to be repossessed." *Id.* at 685. The owner's wife went so far as to lock herself in the car to prevent the repossession.[2]

Those cases, which involved clear notice of a contested title, are night-and-day to this one. The officers knew that Bender was "agitated" and "upset" about vacating the condo—but that didn't give them a reason to believe Surette's assertion of title was anything other than "sane" and "credible." R. 31, Pg. ID 569, 582, 591. Bender recalls making only a brief and unsupported claim that there might have been another will during the hourlong interaction. And she never explained *why* that will would give her a competing claim to title (or invalidate Surette's claim). So, for all the officers knew, Bender's copy of the "last" and "true" will was identical to the one they'd already seen. R. 27, Pg. ID 386. In short, our cases wouldn't have provided officers notice that their actions were unreasonable given Bender's vague protestations.

The majority also suggests the officers needed a court order—like an eviction notice or confirmation of title—to act reasonably. But we don't "require officers to act pursuant to a court order for their seizure to be reasonable." *Couzens v. City of Forest Park*, 114 F.4th 571, 578 (6th Cir. 2024); *see also Howell*, 148 F.4th at 851. Instead, a court order simply makes it "nearly impossible" to show that officers' actions were unreasonable. *Couzens*, 114 F.4th at 578. So the officers here had no reason to think a court order was necessary, especially when they had seen Surette's copy of the will, which named him—not Bender—as a beneficiary.

---

[2]The majority claims *Revis v. Meldrum* further supports that the officers acted unreasonably. 489 F.3d 273 (6th Cir. 2007); Maj. Op. at 18. But *Revis* provides no help. There, a deputy sheriff tried to satisfy a writ of execution from a state-court judgment by evicting the plaintiff. *Revis*, 489 F.3d at 277. Unlike this case, the deputy was directly performing an eviction based on a court order, not peacekeeping during a private repossession. And there, our court found that the Tennessee law determining the eviction's procedure was so unclear that the officer was "entitled to qualified immunity for the reasonable mistake of law that occurred." *Id.* at 287. In short, *Revis* is so different from this case that it wouldn't have put the officers on notice that they were violating Bender's rights.

\*      \*      \*

Police officers are trained to protect the public, not pore through casebooks.  And with this much uncertainty in our caselaw, the officers here faced constitutional questions that weren't "beyond debate," but were mired in it.  *al-Kidd*, 563 U.S. at 741.  That means they're entitled to qualified immunity.

During evictions and repossessions, emotions run high, and conflict is almost inevitable.  Sometimes that conflict can even turn violent.  So law-enforcement officers play an important role in proactively defusing those situations before they get out of hand.  By denying qualified immunity here, the majority places officers in a Catch-22:  intervene and risk facing liability, or wait on the sidelines until they receive a court order or a frantic 911 call.  But by then, it might be too late to prevent a tragedy.

I respectfully dissent.